Searles v. SSA                    CV-99-548-B            10/13/00

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Stephen R. Searles


    v.                                    Civil No. 99-548-B
                                          Opinion No. 2000 DNH 214

Kenneth Apfel, Commissioner,
Social Security Administration


MEMORANDUM AND ORDER

Stephen R. Searles applied for Title II Social Security

Disability Insurance Benefits on August 8, 1996.  Searles alleged

an inability to work since December 29, 1993 due to soft tissue

damage to his right shoulder and elbow.  The Social Security

Administration ("SSA") denied his application initially and on

reconsideration.  Administrative Law Judge ("ALJ") Robert

Klingebiel held a hearing on Searles' claim on July 15, 1997.  In

a decision dated October 9, 1997, the ALJ found that Searles was

not disabled.  On October 15, 1999, the Appeals Council denied

Searles' request for review, rendering the ALJ's decision the

final decision of the Commissioner of the SSA.

Searles brings this action pursuant to § 405(g) of the Social Security Act (the "Act") seeking review of the denial of his application for benefits.  See 42 U.S.C. § 405(g) (2000). Before me are Plaintiff's Motion for Order Reversing the Decision of the Secretary (Doc. No. 6) and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 7).  For the reasons set forth below, I conclude that the ALJ's decision that Searles was not entitled to benefits was supported by substantial evidence.  Therefore, I affirm the Commissioner's decision and deny Searles' motion to reverse.

## I.  BACKGROUND[1]

Searles was thirty-eight years old when he filed his application for benefits on August 8, 1996.  He graduated from high school.  Searles worked as a chicken de-boner in a chicken processing plant from 1984 to 1985 and as a youth counselor at a

[1]  Unless otherwise noted, the procedural and factual background set forth in this Memorandum and Order derives from the joint statement of material facts submitted by the parties.

-2-

youth detention center from 1985 until 1993. He is left-handed.

On December 29, 1993, one of Searles' co-workers at the youth detention center grabbed Searles' right elbow and pulled it upwards and backwards. Searles had previously injured his right shoulder in a motorcycle accident in 1982. Despite this prior injury, Searles could do "pretty much anything he wanted to do." As a result of this new incident, however, Searles experienced pain in his right elbow and shoulder.

In response to his pain, Searles saw Dr. Gerard Hevern. Tr. at 178[2]. Dr. Hevern noted that Searles had decreased strength and range of motion in his right shoulder and referred him for physical therapy. Id. He felt that Searles could fully recover and should be able to return to full employment. Id. at 179. Searles underwent physical therapy until February, 1994, when his symptoms worsened.

In March, 1994, Dr. William Kilgus, an orthopedic surgeon, examined Searles. Dr. Kilgus reported limited range of motion in

---

[2] "Tr." refers to the certified transcript of the record submitted to the Court by the SSA in connection with this case.

Searles' right shoulder and elbow and significant atrophy over the right biceps muscle and right shoulder girdle muscles. In his opinion, Searles' limited range and atrophy were a reflection of his 1982 injury. He ordered an electromyogram ("EMG")[3] and nerve conduction study to rule out any new injury.

Dr. Kilgus eventually concluded that Searles had sustained merely a strain to the soft tissue of the upper right extremity and that at most it was "a temporary aggravation of a pre-existing condition." On April 5, 1994, Dr. Kilgus noted that Searles was doing well and that his symptomology had gradually subsided. Dr. Kilgus felt that exercise would be beneficial for Searles' shoulder. He suggested that Searles resume working on a modified basis and gradually work back into his normal routine.

On May 4, 1994, Dr. Richard Hockman examined Searles. Dr. Hockman observed that Searles experienced pain with abduction and external rotation of his right shoulder and diagnosed a probable

---

[3] An electromyogram is a graphic representation of the electric currents associated with muscular action. Stedman's Medical Dictionary 497 (25th ed. 1990).

rotator cuff tear.  However, an arthrogram[4] revealed no rotator cuff tear.

At a follow-up visit on June 7, 1994, Dr. Hockman concluded that Searles had sustained a C5 nerve root injury which had not responded.  Searles had good range of motion but continued to have some pain and twitching in the anterior part of his right shoulder.  Dr. Hockman stated that the nerve root injury required physical therapy, but that Searles was concerned that such therapy made his arm sore.  Tr. at 223.  Dr. Hockman's feeling was that "despite the pain, [Searles] [was] going to have to work through it."  Id.  Moreover, he stated that if Searles followed through "he might very well be able to overcome this problem."  Id.  On August 24, 1994, Dr. Hockman opined that Searles was incapable of his usual occupation because of the serious nature of his injury.

---

[4] An arthrogram is a roentgenogram of a joint.  The term usually implies the introduction of a contrast agent into the joint capsule.  Stedman's Medical Dictionary 135 (25th ed. 1990).

On September 15, 1995, at the request of the New Hampshire Workers Compensation Commission, Dr. David Steinberg examined Searles. Tr. at 235. He diagnosed Searles with status-post probable right shoulder strain on December 29, 1993 and status-post 1982 motor vehicle accident with resultant injury to the upper trunk of the right brachial plexus with residual weakness in the C5 and C6 innervated muscles. Dr. Steinberg felt that Searles should not lift anything with his right arm and could not return to his youth counselor position. He believed that Searles could perform at least a full-time light duty job.

Dr. Steinberg referred Searles to a physical therapist for a functional capacity evaluation. The evaluation showed that Searles could reach overhead, crawl, and balance using his right arm only occasionally, but could use his left arm and both legs frequently. The test results emphasized that Searles completed the evaluation with a low pain profile. Tr. at 234. The physical therapist concluded that although Searles did not have the ability to return to work as a youth counselor, he did have

the ability to perform light-medium to medium work on a full-time basis.

## A.    Initial Treatment and Evaluation by Dr. Botsford

Dr. Hevern subsequently referred Searles to Dr. Daniel Botsford, who examined him on November 16, 1994.  Tr. at 241. During the examination, Searles complained of quivering in his right arm, especially after using that arm.  He also reported needle-like sensations in his right shoulder and elbow and tingling in the fingers of his right hand.  Dr. Botsford noted marked atrophy of Searles' upper right arm and a lesser degree of atrophy in his right forearm.  A neuromuscular examination revealed weakness in the deltoid and virtually no strength in the biceps, infraspinatus[5], and brachioradialis[6].  A sensory examination revealed a diminution in an epaulette distribution descending onto Searles' arm in a fashion compatible with the

_____

[5]  The infraspinatus muscle extends the arm and rotates it laterally.  Stedman's Medical Dictionary 783, 999 (25th ed. 1990).

[6]  The brachioradialis muscle flexes the forearm.  Stedman's Medical Dictionary 995 (25th ed. 1990).

dermatomes[7] served by either the C5 or C6 nerve.  Dr. Botsford

opined that Searles had a C5 radiculopathy[8] and speculated that

he had avulsed the C5 nerve root.

In March, 1995, Dr. Botsford stated that Searles was most

suited to light and sedentary tasks that did not require right

shoulder control or right biceps or elbow/shoulder stability.  In

May, 1995, Dr. Botsford reported that Searles had a partial work

capacity, so long as his work did not require a stable right

shoulder or any flexion of the elbow.  He noted that Searles'

pain constrained his stamina.  He further opined that Searles

could return to work with modifications.  According to Dr.

Botsford, Searles could work two to four hours a day and could

lift and carry a maximum of ten pounds, and no more than five

pounds frequently, using his right arm.  He also found that

Searles could use his left arm to lift and carry fifty pounds,

---

[7]  A dermatome is the area of skin supplied by cutaneous branches from a single spinal nerve.  Stedman's Medical Dictionary 419-20 (25th ed. 1990).

[8]  A radiculopathy is a disease of the spinal nerve roots. Stedman's Medical Dictionary 1308 (25th ed. 1990).

and thirty pounds frequently.

During the course of treatment, Dr. Botsford suggested a number of methods to alleviate Searles' pain, including a prescription for Mexiletine[9].

B.    **Interim Examinations and Evaluations**

In May, 1995, Dr. A.M. Drukteinis prepared a psychological pain profile of Searles.  When questioned by Dr. Drukteinis, Searles reported that his prescribed medication did not alleviate his pain, but that Tylenol 3 worked well and he drank alcohol to help relieve his symptoms.  The doctor observed that Searles displayed "only mild pain behavior."  Searles said that his only current method of physical therapy was to perform range of motion exercises for ten minutes, two to three times per week.  Tr. at 267.  Dr. Drukteinis observed that Searles: (1) had taken a passive and helpless role in his own rehabilitation; (2) appeared content to relieve his pain with alcohol; and (3) disagreed with

_____

    [9]  Mexiletine is a local anisthetic, antiarrhythmic agent, that is structurally similar to lidocaine, but orally active. Physicians' Desk Reference 804 (54th ed. 2000).

the idea that it was up to him to look for a job.

Dr. Drukteinis evaluated Searles in a number of ways. The McGill and Dallas Pain Questionnaires indicated that Searles experienced mild to moderate pain. The Pain Drawing Test, however, showed a good measure of complaint magnification. The Beck Depression Inventory indicated a moderate degree of depression. Based on the Millon Behavioral Health Inventory ("MBHI"), Searles' psychological profile makes him "highly susceptible" to psychosomatic ailments. Tr. at 269. The MBHI further indicated that Searles will "overreact to any severe or prolonged physical problem." Id. Dr. Drukteinis opined that his prognosis from a psychological standpoint was guarded.

Dr. Robert Leffert examined Searles on January 31, 1996. Tr. at 276-78. Searles told him that the prescribed pain medication had not helped him and that his primary means of controlling his pain was drinking alcohol. Dr. Leffert found that Searles had limited range of motion, and atrophy of the muscles, in his right arm and shoulder. Tr. at 277. After

-10-

examination, Dr. Leffert concluded that Searles had "the residue of a brachial plexus injury that was probably engrafted on a prior plexus injury" and a significant pain problem. Id.

C.    The Ultimate Opinion of Dr. Botsford

In February, 1996, Dr. Botsford again examined Searles. Dr. Botsford noted that Searles' right shoulder and elbow remained painful but he had good range of motion. Dr. Botsford opined that Searles had a 58% impairment of his right arm that equated to a 35% whole person impairment.

Dr. Botsford next saw Searles in November, 1996. Searles reported that performing one household chore for as little as one hour resulted in increased pain and required him to rest for up to five hours. His other activities included riding a mountain bike, working on a farm two weekends a month, and caring for his seven year old daughter on the other two weekends a month.

Dr. Botsford found that Searles' left upper limb and both lower limbs had full strength. His right grasp, wrist extension, and finger extension only registered four-fifths of normal. Dr.

Botsford ultimately opined that Searles did not have substantial rehabilitation potential or employable capacity due to alcohol abuse, despair, pain, and poor stamina.

### D.   Subsequent Assessments of Searles

In November, 1996, Dr. Campbell, a Disability Determination Service medical consultant, reviewed the available medical evidence and prepared an assessment of Searles' physical functional capacity.  Dr. Campbell never examined or spoke with Searles.  He found that Searles could sit or stand for six hours in an eight-hour workday and could lift and carry twenty pounds occasionally and ten pounds frequently.  He also noted that Searles should not do overhead reaching because of the very limited function in his right shoulder.

In February, 1997, Dr. Hans Standow conducted a comprehensive psychiatric profile of Searles.  Searles told Dr. Standow that he could not do heavy work because of weakness in his right arm.  He reported that medication did not help his condition and that only alcohol relieved his pain.  Dr. Standow

diagnosed generalized anxiety disorder with recurrent depression, alcohol dependence, and borderline personality disorder. He noted that Searles was of at least average intelligence and should be able to learn and remember tasks. He had the ability to communicate, but needed guidance to develop new skills and find his direction.

## II. **STANDARD OF REVIEW**

After a final determination by the Commissioner denying a claimant's application for benefits, and upon a timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. 42 U.S.C. § 405(g). My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence. Id.; see Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). The ALJ is

responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. See Irlanda Ortiz, 955 F.2d at 769. Therefore, I must "'uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). I apply these standards in reviewing Searles' case on appeal.

## III.  DISCUSSION

The Social Security Act defines "disability" for the purposes of Title II as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2000). When evaluating whether a claimant is

disabled due to a physical or mental impairment, an ALJ's analysis is governed by a five-step sequential evaluation process.[10]  See 20 C.F.R. § 404.1520 (2000).

At step three in the process, the ALJ must determine whether the claimant's impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520(d).  At step four, the ALJ must determine whether the claimant's impairment prevents him from performing his past work.  20 C.F.R. § 404.1520(e).  To make this determination, the ALJ must assess both the claimant's residual functional capacity ("RFC"), that is, what the claimant can do despite his impairments, and the demands of the claimant's prior employment.  See id.; Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991) (per curiam).  The claimant

---

[10]    The ALJ is required to consider the following five issues when determining if a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents or prevented the claimant from performing past relevant work; and (5) whether the impairment prevents or prevented the claimant from doing any other work.  20 C.F.R. § 404.1520 (2000).

bears the burden of showing that he does not have the RFC to perform his past relevant work.  See Santiago, 944 F.2d at 5.

Ultimately, at step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform."  Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Secretary of Health and Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam).  The Commissioner must show that the claimant's limitations do not prevent him from engaging in substantial gainful work, but need not show that the claimant could actually find a job.  See Keating, 848 F.2d at 276.

In the present case, the ALJ concluded at step three of the sequential evaluation process that Searles did not have an impairment which met or equaled the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. A.L.J. Decision at 2, 12 (Tr. at 15, 24).  At step four, the ALJ found that Searles was unable to return to his prior employment because of the condition of his right shoulder and elbow.  Id. at

9, 13 (Tr. at 22, 25).

Ultimately, at step five, the ALJ found that although Searles had a severe impairment that precluded his return to his former employment and limited the range of work he could perform, he retained the RFC to perform certain types of light work.[11] Id. (Tr. at 22, 25). The ALJ found, based upon the testimony of a vocational expert, that Searles was capable of making an adjustment to work which exists in significant numbers in the national economy. Id. at 10-13 (Tr. at 23-25).

Searles argues that the ALJ's denial of his application for benefits at step five was tainted by a variety of legal errors. First, Searles contends that the ALJ failed to assign proper

---

[11] Light work may involve "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," "a good deal of walking or standing," and/or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b) (2000). "If someone can do light work, . . . [he ordinarily] can also do sedentary work." Id. Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools"; occasional "walking and standing"; and frequent "sitting." 20 C.F.R. § 404.1567(a) (2000).

weight to the opinion of Dr. Botsford, a treating physician. <u>See</u>
Mem. in Supp. of Pl.'s Mot. for Order to Reverse (Doc. No. 6) at
4-11. Second, Searles argues that the ALJ improperly relied on
vocational expert testimony based on a hypothetical question
which did not include impairments that the ALJ found to be
severe. <u>See</u> <u>id.</u> at 11-12. Finally, Searles argues that the
ALJ's finding that Searles' statements concerning his impairments
and their impact on his ability to work were not entirely
credible is not supported by substantial evidence. <u>See</u> <u>id.</u> at
12-14. I address each of these arguments in turn.

**A.** **<u>The ALJ's Weighing of Dr. Botsford's Opinion</u>**

On November 18, 1996, Dr. Botsford opined that Searles
lacked substantial rehabilitation potential or "employable
capacity." Tr. at 264. Searles contends that the ALJ erred by
not according greater, if not controlling, weight to this
opinion. <u>See</u> 20 C.F.R. § 404.1527(d)(2) (2000).

Deference to the opinions of treating physicians is not
universal. An ALJ must give controlling weight to the opinion of

a treating physician only where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). In addition, opinions on issues that are reserved to the Commissioner, such as an opinion that an individual is disabled or unable to work, are "never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, *2; see 20 C.F.R. § 404.1527(e).

When an ALJ concludes that a treating physician's opinion is not entitled to controlling weight, he must determine the appropriate weight to be given to the opinion by evaluating certain factors. 20 C.F.R. § 404.1527(d)(2); see SSR 96-5p, 1996 WL 374183, *3 (even when evaluating an opinion on an issue reserved to the Commissioner the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(d)). The ALJ must consider: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment

relationship; (iii) whether and to what extent the opinion is supported by medical signs and laboratory findings; (iv) whether the opinion is consistent with other evidence in the record; (v) whether the physician's opinion concerns medical issues related to his area of specialty; and (vi) any other factors which support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(d)(6).

In this case, the ALJ found that Dr. Botsford's opinion on work capability was not persuasive because it was "inconsistent with the objective findings on physical examination and the claimant's wide range of activities of daily living." A.L.J. Decision at 5 (Tr. at 18). After reviewing Searles' medical history, including the length, frequency, nature and extent of his relationship with Dr. Botsford, the ALJ based his assessment of Dr. Botsford's opinion on several specific, valid reasons. A.L.J. Decision at 3-5 (Tr. at 16-18). First, the ALJ noted that Dr. Botsford's opinion was not supported by Dr. Botsford's own findings upon examining Searles. The record shows that Dr.

Botsford found that Searles, who is left-handed, continued to have full strength and range of motion in his upper left extremities and both of his lower extremities. Tr. at 263. See 20 C.F.R. § 404.1527(d)(3)-(4). The ALJ also noted that a physical capacities evaluation of Searles in 1994 concluded that he was capable of light to medium work because he had no limitations on his ability to sit, stand or walk. A.L.J. Decision at 3, 5 (Tr. at 16, 18). See 20 C.F.R. § 404.1527(d)(3)-(4). Indeed, the record also shows that Drs. Hevern, Kilgus, Hockman, and Steinberg had previously concluded that Searles was capable of working on a modified basis. See Keating, 848 F.2d at 276 (a "treating physician's conclusions regarding total disability may be rejected by the [ALJ] especially when...contradictory medical advisor evidence appears in the record"); 20 C.F.R. § 404.1527(d)(3)-(4); SSR 96-2p, 1996 WL 374188, *3.

In addition to concluding that Dr. Botsford's opinion was lacking in medical foundation and was inconsistent with other

-21-

medical opinions in the record, the ALJ also concluded that the opinion was inconsistent with the wide range of activities Searles performed in his daily life. A.L.J. Decision at 5 (Tr. at 18). See SSR 96-2p, 1996 WL 374188, *3. The ALJ noted that Searles walked up to six miles per day, rode a mountain bike, and performed household chores. A.L.J. Decision at 5 (Tr. at 18). See 20 C.F.R. § 404.1527(d)(6); SSR 96-2p, 1996 WL 374188, *3.

Since the ALJ and not the treating physician must determine whether Searles is disabled, and since substantial evidence in the record supports the ALJ's decision to place less weight on Dr. Botsford's opinion, I reject Searles' argument that the ALJ erred in disregarding Dr. Botsford's opinion.

**B.     Hypothetical Question Posed to the Vocational Expert**

Searles next argues that the ALJ improperly relied on vocational expert ("VE") testimony based on a hypothetical question that did not include impairments that the ALJ found to be severe. Once a claimant proves that he is incapable of returning to his prior jobs, the burden shifts to the

Commissioner to come forward with evidence of specific jobs in the national economy that the claimant is capable of performing. See Arocho v. Secretary of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982); 20 C.F.R. § 404.1520(f). The Commissioner can meet his burden of proof on this issue by relying on the testimony of a VE, but in order to be entitled to rely on the VE's answer, the ALJ must pose a hypothetical question to the VE which accurately reflects the claimant's functional limitations. See Rose v. Shalala, 34 F.3d 13, 19 (1st Cir. 1994); Berrios Lopez v. Secretary of Health and Human Servs., 951 F.2d 427, 429-30 (1st Cir. 1991) (per curiam). That is, the ALJ may credit the VE's response only if there is "substantial evidence in the record to support the description of the claimant's impairments given in the ALJ's hypothetical" to the VE. Berrios Lopez, 951 F.2d at 429.

In this case, the ALJ, at the July 15, 1997 hearing, called a VE to testify as to (1) Searles' ability to perform his past relevant work; and (2) whether there were any jobs in the

-23-

national economy which Searles was capable of performing.  Tr. at 55-60.  At the hearing, the ALJ and the VE engaged in a colloquy, the relevant sections of which are as follows:

> ALJ: Now I want to ask you some brief questions that will take into account a number of different factors...we're dealing with someone who is best suited to work in a job where the tasks are routine in nature or repetitive in nature without a great deal of change from day to day in terms of the operation...
>
> VE: Could you repeat that last limitation, Your Honor, about repetition?
>
> ALJ: Yes.  If we're dealing with someone who is best suited to work in a job that wasn't particularly different from day to day, that is where someone had to learn new tasks.  Someone had to learn and deal with more complex or detailed instructions, where someone is doing more routine types of tasks – perhaps this could be learned in a relatively short period of time.  They were entry level types of tasks that could be performed.
>
> VE: So the limitation is that they could not learn more complicated tasks that were changing?
>
> ALJ: That's correct.

Tr. at 58-60.  After concluding that Searles could not return to his prior jobs, the ALJ and the VE then discussed the type and number of jobs in the national economy that Searles would be able

-24-

to perform given his functional and vocational limitations.  Tr. at 60-63.

After this discussion, Searles' attorney examined the VE. Tr. at 63-66.  He specifically questioned the VE as to whether depression and difficulty in interpersonal interactions would further limit the hypothetical individual's employment options. Id.  The VE responded that, although such limitations would prevent an individual from performing certain jobs, it "wouldn't be a problem" for many other positions that the individual was otherwise qualified to perform.  Tr. at 65.

The ALJ ultimately found that Searles had an anxiety disorder with recurrent depression and alcohol dependence. Searles contends that because the ALJ's hypothetical did not mention these impairments, or any possible limitations that might flow from these impairments, the ALJ could not properly rely on the VE's response as a basis for a finding that Searles was not disabled.  In support of his argument, Searles recites a number of possible limitations flowing from his impairments, all of

which were noted by Dr. Drukteinis in his 1995 psychological pain profile of Searles. See Mem. in Supp. of Pl.'s Mot. for Order to Reverse (Doc. No. 6) at 11.

Searles' argument falls wide of the mark. The ALJ ultimately adopted the findings of Dr. Standow, not Dr. Drukteinis. It is the ALJ's responsibility to resolve ambiguities in the record and decide what testimony will be credited when formulating a hypothetical question. Arocho, 670 F.2d at 375. Therefore the conclusions of Dr. Drukteinis, who examined Searles almost two years before Dr. Standow, are not necessarily limitations that flow from the ALJ's finding and therefore need not have been included in the hypothetical.

In framing his hypothetical to the VE, the ALJ essentially paraphrased the functional limitations imposed on Searles by his anxiety disorder, as found by Dr. Standow: an inability to learn new tasks or perform complex tasks. In addition, the questions posed by Searles' attorney, and the VE's responses thereto, regarding depression and difficulty in interaction with others,

supplemented the record and provided the ALJ with substantial evidence upon which to reach a conclusion of "not disabled". See Herron v. Shalala, 19 F.3d 329, 337 (7th Cir. 1994) (finding no error where ALJ failed to refer to all of claimant's complaints in framing his question because VE had previously reviewed record and attorney expanded the record by posing additional hypotheticals that included those impairments); Shively v. Heckler, 739 F.2d 987, 990-91 (4th Cir. 1984) (ALJ's failure to ask questions cured when claimant's attorney posed hypotheticals to VE based on claimant's view of evidence).

I therefore conclude that the ALJ was entitled to rely upon the VE's testimony in arriving at the determination that Searles was not disabled.

## C.    The ALJ's Credibility Assessment

Finally, Searles argues that the ALJ's finding that his statements concerning his impairments and their impact on his ability to work were not entirely credible is not supported by substantial evidence. Searles contends that the ALJ improperly

relied on Searles' limited daily activities to discredit his statements that he had a disabling impairment. See Mem. in Supp. of Pl.'s Mot. for Order to Reverse (Doc. No. 6) at 12-13. Searles also takes issue with the ALJ's statement that the physical examinations of Searles are inconsistent with his complaints of disabling pain. Id. at 13-14. For the following reasons, I disagree.

The SSA regulations require an ALJ to consider a claimant's own subjective statements concerning his symptoms, including statements regarding how those symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a) (2000). An ALJ must follow a two-step process to evaluate the credibility of a claimant's statements. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that can reasonably be expected to produce the symptom alleged. 20 C.F.R. § 404.1529(b); see DaRosa v. Secretary of Health and Human Servs., 803 F.2d 24, 25 (1st Cir. 1986) (per curiam). Then, if such an impairment exists, the ALJ must evaluate "the intensity

and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [the claimant's] symptoms limit [his or her] capacity for work." 20 C.F.R. § 404.1529(c)(1). At this second stage, the ALJ must consider "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements from [the claimant], [the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." Id.

The Commissioner recognizes that a claimant's subjective statements may suggest a more severe impairment "than can be shown by objective medical evidence alone." 20 C.F.R. § 404.1529(c)(3). Accordingly, an ALJ evaluates a claimant's complaints in light of the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has

-29-

taken to alleviate his pain; (5) treatment, other than medication, the claimant receives or has received for relief of his pain; (6) any measures the claimant uses or has used to relieve pain; and (7) other factors concerning the claimant's limitations and restrictions due to pain.  Id. (emphasis added); see Avery v. Secretary of Health and Human Servs., 797 F.2d 19, 28-29 (1st Cir. 1986).  These factors are sometimes called the "Avery factors."  In addition to considering these factors, the ALJ is entitled to observe the claimant, evaluate his demeanor, and consider how the claimant's testimony fits with the rest of the evidence.  See Frustaglia v. Secretary of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

In assessing the credibility of a claimant's subjective statements, the ALJ must consider whether these complaints are consistent with the objective medical evidence and other evidence in the record.  See 20 C.F.R. § 1529(a).  While a claimant's complaints must be consistent with the medical evidence to be credited, they need not be precisely corroborated with such

-30-

evidence.  See Dupuis v. Secretary of Health and Human Servs.,
869 F.2d 622, 623 (1st Cir. 1989) (per curiam).

In this case, the ALJ considered the Avery factors and
ultimately concluded, contrary to Searles' assertions of
disabling pain, that Searles did not experience pain at a level
that would preclude him from all types of work.  A.L.J. Decision
at 7-9 (Tr. at 20-22).  In his analysis, the ALJ noted that
Searles performs a number of daily household activities such as
cooking, cleaning, and doing laundry.  Id. at 8 (Tr. at 21).  In
addition, he plays pool, gardens, and rides his bicycle almost
every day.  Id. at 8 (Tr. at 21).  He also milks cows two
weekends a month and takes care of his daughter on the other two
weekends.  Id. at 8 (Tr. at 21).  The ALJ found these activities
to be inconsistent with Searles' complaints of disabling pain.

The ALJ also found that the medical evidence in the record
was inconsistent with Searles' complaints of disabling pain.  He
noted that Searles, who is left handed, "has no limitations with
his lower extremities or his upper left extremity."  A.L.J.

Decision at 9 (Tr. at 21). Moreover, as discussed above, the record shows that several doctors had found Searles capable of working. In light of the inconsistency between Searles' complaints of disabling pain and both his activities of daily living and the medical evidence in the record, the ALJ concluded that Searles' statements were not entirely credible. Id. at 8 (Tr. at 21). See Frustaglia, 829 F.2d at 195 n.1 ("Where there are inconsistencies in the record, the ALJ may discount subjective complaints of pain.").

Searles contends that the ALJ erred in relying on Searles' daily activities to discredit Searles' complaints of disabling impairments. Searles primarily bases his argument on cases in which an ALJ either relied exclusively on a claimant's daily activities or misread the record. See, e.g., Baumgarten v. Chater, 75 F.3d 366, 368-70 (8th Cir. 1996); Hogg v. Shalala, 45 F.3d 276, 279-79 (8th Cir. 1995). It is clear, however, from the relevant SSA regulations, that an ALJ can consider a claimant's "daily activities," among other factors, in determining the

credibility of a claimant's complaints of pain. 20 C.F.R. §

404.1529(c)(3)(i); see also Roe v. Chater, 92 F.3d 672, 677 (8th

Cir. 1996) ("more telling than a chronicle of [claimant's]

various ailments are his actual activities, which are incongruous

with his contention that he cannot work"); SSR 96-7p, 1996 WL

374186, *3.

In this case, the ALJ considered both the objective medical

evidence in the record and Searles' daily activities in reaching

his credibility determination. See Frustaglia, 829 F.2d at 195

n.1. Moreover, there is other evidence in the record to support

the ALJ's decision. For example, both Dr. Drukteinis and the

physical therapist that tested Searles noted that he exhibited

low or, at most, moderate pain behavior. Tr. at 234, 267-69. In

addition, Dr. Drukteinis noted that someone with Searles'

psychological profile is likely to exaggerate his symptoms. Tr.

at 267-69.

Given this, I find that the ALJ's decision was supported by

substantial evidence. See Rodriguez Pagan v. Secretary of Health

and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (a court "must affirm the [ALJ's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.")

Lastly, Searles contends, in passing, that the ALJ's statement that the physical examinations of Searles are inconsistent with complaints of disabling pain was factually erroneous. The record here shows, as discussed above, that Drs. Hevern, Kilgus, Hockman, and Steinberg, among others, had concluded that Searles was not completely disabled and could still perform some forms of light work. Although reasonable minds could differ on how to evaluate the medical evidence, I conclude that the ALJ's determination that Searles' complaints of pain were inconsistent with the medical evidence is supported by substantial evidence and thus entitled to deference. See Frustaglia, 829 F.2d at 195; Rodriguez Pagan, 819 F.2d at 3.

## IV. CONCLUSION

Since I have determined that the ALJ's denial of Searles'
application for benefits was supported by substantial evidence, I
affirm the Commissioner's decision.  Accordingly, Searles' motion
to reverse and remand (Doc. No. 6) is denied, and defendant's
motion for an order affirming the decision of the Commissioner
(Doc. No. 7) is granted.  The clerk shall enter judgment
accordingly.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

October 13, 2000

cc: Jeffrey A. Schapira, Esq.
    David L. Broderick, Esq.